1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10  WILLIE YORK, et al.,                    Case No.  14-cv-02471-RS

            Plaintiffs,

11

        v.

12                                          ORDER GRANTING IN PART AND
                                            DENYING IN PART MOTIONS TO
13  BANK OF AMERICA, et al.,                 DISMISS

            Defendants.

14

15

16                                  I.  INTRODUCTION

17          The alleged victim of predatory lending practices that placed title to his home in jeopardy,

18  Willie York, along with his daughter Carolyn York Miles (collectively, "plaintiffs"), bring this

19  action naming (1) Bank of America, N.A. ("BOA"), (2) Champion Mortgage Company, (3)

20  Stephen Talcott, (4) James B. Nutter and Co., (5) Thomas Perkins, (6) Reverse Mortgages of

21  California, Inc. ("RMC"), and (7) Agnes McNamara.   Against these defendants, plaintiffs' First

22  Amended Complaint ("FAC") alleges violations of federal law, in addition to a host of state tort

23  and contract law claims, for the role each allegedly played in defrauding York into two reverse

24  mortgages on his home.

25          The first five of the seven aforementioned defendants now move to dismiss the various

26  averments they face on the grounds that plaintiffs fail to state a claim.  Pursuant to Local Rule 7-

27  1(b), this matter was found suitable for disposition without oral argument.  For the reasons set

28  forth below, these motions are granted in part and denied in part, with partial leave to amend.

United States District Court
Northern District of California

## II. BACKGROUND

Taking the facts as alleged in the FAC, plaintiff Willie York, who is eighty-eight years old, lives in a house at 80 Conkling Street in San Francisco, which he owns as tenants-in-common with his daughter and co-plaintiff Carolyn York Miles.  York has occupied the home "continuously" for over forty-five years and shares it with his grandson, Durrel.  (FAC ¶ 19).  He is illiterate and has a third-grade level education.  After spending most of his life working as a laborer, York lives entirely off his social security income of approximately $950 per month.

York claims he was the victim of a series of fraudulent acts and deceptive lending practices beginning in 2007.  That year, he was approached by Thomas Perkins, a loan broker for RMC.  Perkins dropped by York's home and left a message explaining that he had "money for him." (FAC ¶ 21).

Perkins and York arranged to meet at York's home.  Perkins encouraged York, who was in need of extra income to complete repairs on his home, to execute a reverse mortgage secured by the equity in his property.  Perkins assured York that he would not need to make any payments on the home "for the rest of his life."  (FAC ¶ 22).  More specifically, Perkins told York that the remaining mortgage on the home would be paid off completely, and that any remaining value would pass to York's heirs upon his death.

A.  First Reverse Mortgage

York signed the requisite loan documents on June 25, 2007 during a second meeting at his home with Perkins.  Perkins quickly flipped through the papers and instructed York where to sign. "The meeting lasted only long enough for Perkins to obtain Plaintiff's signatures."  (FAC ¶ 24). Perkins did not provide York with any papers regarding the terms of the loan, funded by money lender James Nutter.

In order to push the loan through quickly, Perkins conspired with plaintiffs' family friend Norma Faye Maxwell.  Having met Maxwell at plaintiff's home, Perkins directed Maxwell to forge Miles' signature on a grant deed transferring Miles' interest in the home to York in order to facilitate the loan.   No notary was present at the time Miles' signature was forged; rather, Miles' signature was later notarized by Stephen Talcott, a California notary public.

In addition to arranging the reverse mortgage, Perkins played a role in subsequent repairs to York's home, providing him with the contractor Alexander Restoration Inc. ("ARI"). York contracted with ARI to perform $38,500 worth of repairs to the property. Over the course of several months in 2008, Perkins presented checks to plaintiff and instructed him to sign, explaining that they would go towards paying ARI's balance. York, however, was apparently unhappy with the arrangement—"[o]n several occasions Plaintiff objected saying the work was not properly done, but when Perkins told York he was creating a problem and pressured him, York signed the checks." (FAC ¶ 26).

Perkins used the remaining proceeds of the 2007 loan to create an account in York's name at Principal Financial Group ("PFG") without his consent. As of August 27, 2007, the account held a balance of $111,807.55. Two years later, it had been depleted entirely. Maxwell periodically accompanied York to the local "check cashing" establishment and had him endorse checks for the proceeds of the 2007 loan. (FAC ¶ 28).

B.   Second Reverse Mortgage

In 2009, Perkins brokered a second or further reverse mortgage, this time funded by BOA, which paid off the 2007 loan and provided an additional $78,000. York did not request a mortgage in 2009, nor did he sign or authorize the signing of any new loan papers. He also received no money from the alleged second mortgage. York did not become aware of the account depletion mentioned above or this second reverse mortgage until several years thereafter.

That same year, York was notified by the City and County of San Francisco that he owed certain property taxes on his home. Prepared to make a payment, he ventured to City Hall accompanied by Maxwell. The city clerk informed him that BOA had already made the property tax payment. "This was consistent with what the loan broker, Perkins had told him; that he would not have to make any payments on the home in his lifetime . . . ." (FAC ¶ 31).

Sometime in 2013, however, York received another letter, this time from BOA, telling him he was in arrears on his property tax payments. This confused York, who had been under the impression that he no longer had any payment obligations on his home after the 2007 reverse mortgage. York's daughter, Janice Hardy, called BOA. The bank explained that, contrary to

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS
CASE NO.   14-cv-02471-RS

3

1   York's earlier understanding, he was obligated to continue to pay insurance and property taxes on

2   his home.  Hardy and the BOA agent reached an oral agreement—that York would pay $200 per

3   month until the property tax arrears were satisfied.  Hardy asked for, but did not receive, a written

4   confirmation of this agreement.  York nevertheless made, and BOA accepted, ten monthly

5   payments of $200 each.

6   Despite York's performance of his end of the bargain, BOA and its agent/servicer

7   Champion nevertheless commenced foreclosure proceedings.  In April 2014, York received a

8   notice of a trustee sale on his home set for June 15, 2014.  On May 24, 2014, another notice of sale

9   was left at his home, this time alerting York that the sale would occur on June 4, 2014.  According

10  to the notice, York was in default on the purported 2009 reverse mortgage.

11  At that point in 2014, York sought assistance from Bayview Hunters Point Community

12  Legal ("BVHPCL"), which reached out to BOA and Champion in an attempt to gather more

13  information about the foreclosure sale.  On April 18, 2014, BVHPCL sent BOA a Qualified

14  Written Request ("QWR") pursuant to the RESPA statute to obtain information about the loan and

15  servicing history.  BOA timely replied with a letter informing BVHPCL that Champion had

16  become the servicer of York's loan.  Although Champion eventually responded to the QWR, the

17  documents it transmitted do not constitute a "substantive response" to the QWR because they do

18  not provide a "complete history" of the loans that would allow plaintiffs to verify the details of the

19  loans "and the payment and disbursements of moneys related to the purported 2009 loan."  (FAC ¶

20  36).  Accordingly, York never received a timely or substantive response to his QWR.

21  York filed the initial complaint in this action, accompanied by a request for a temporary

22  restraining order ("TRO") to halt the foreclosure sale, on May 29, 2014.  That same day, then-

23  named defendants BOA and Champion were ordered to file a written response, if any, by the

24  afternoon of June 2, 2014. (ECF No. 3).  The same order instructed York to serve all relevant

25  filings on defendants by May 30, 2014.

26  With no response from defendants, a TRO issued on June 3, 2014 and ordered defendants

27  to show cause why a preliminary injunction should not be entered upon the expiration of the TRO.

28

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS
CASE NO.  14-cv-02471-RS

4

Again, the relevant deadline passed without word from defendants, who had been ordered to file a written opposition by June 13, 2014.  Since the TRO's issuance, the parties repeatedly stipulated to continue the hearing on York's motion for a preliminary injunction so that plaintiffs could file the FAC, which they did on September 25, 2014.  In the meantime, Champion rescinded the notice of default and action to foreclose.  Plaintiffs' motion for a preliminary injunction was accordingly denied on October 20, 2014.  That disposition also ordered Champion to deliver advance notice to the Court of any intention to re-commence the foreclosure process.  BOA, Champion, Talcott, Nutter and Perkins now move to dismiss various claims in the FAC.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard asks for "more than a sheer possibility that a defendant acted unlawfully."  *Id.*  The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense."  *Id.* at 679.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).  In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong."  *Vess v. Ciba–Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

United States District Court
Northern District of California

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil

Procedure tests the legal sufficiency of the claims alleged in the complaint.  *See Parks Sch. of*

*Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal under Rule 12(b)(6) may

be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts

alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

(9th Cir. 1990).  When evaluating such a motion, the court must accept all material allegations in

the complaint as true, even if doubtful, and construe them in the light most favorable to the non-

moving party.  *Twombly*, 550 U.S. at 570.  "[C]onclusory allegations of law and unwarranted

inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim."

*Epstein v. Wash. Energy Co.,* 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at

555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory

statements," are not taken as true).

## IV. DISCUSSION

### A.  Claims Against Nutter

Alleging only that Nutter funded the 2007 reverse mortgage, the FAC contains no facts to

suggest Nutter was aware of the misrepresentations that induced York to sign the loan documents,

let alone complicit in any wrongdoing.  All claims as to Nutter are therefore dismissed with leave

to amend, in the event that plaintiffs can furnish facts that might support maintaining Nutter as a

defendant in this action.

### B.  Claims Against Talcott

As currently pleaded, plaintiffs' claims against Talcott are time-barred and must therefore

be dismissed.  California Code of Civil Procedure Section 338(f) prescribes a six-year maximum

statute of limitations period for an action against a notary for conduct committed in his or her

official capacity.  A notary's official duties include taking the acknowledgement of deeds,

verifying the identity of signatories, and collecting their signatures.  Cal. Gov. Code §§ 8205-

8207.  While such an action ordinarily expires in just three years, if the action is based on notarial

malfeasance, the limitations period is tolled until the aggrieved party discovers the underlying

facts.  The action must then be filed within one year of discovery (or three years from the notarial act, whichever is later).  Cal. Code Civ. P. § 338(f)(1), (2).  Notwithstanding these provisions, however, every action against a notary in his official capacity is subject to a six-year bar running from the date of the notarial act—irrespective of whether the action is based on malfeasance and when the aggrieved party discovered it.  *Id.* § 338(f)(3); *Butterfield v. Northwestern National Insurance Company*, 100 Cal. App. 3d 974, 979 (1980).

Plaintiffs' allegations against Talcott all arise from his notarization of the 2007 reverse mortgage documents, an act taken in Talcott's official capacity as a notary public.  It would therefore appear on the face of the FAC that the statute of limitations on claims against him expired six years later in 2013, the year prior to the filing of York's initial complaint.  The claims against Talcott must, therefore, be dismissed.  Plaintiffs are granted leave to amend to the extent they are able to demonstrate that Talcott's notarial acts are not the foundation for their various claims against him, or that the statutorily prescribed limitation period should not apply.  *See Purdum v. Holmes*, 187 Cal. App 4th 916, 924 (2010).

C.  Homeowner's Bill of Rights Claim Against Champion (Claim 2)

In light of Champion's withdrawal of the notice of default and action to foreclose it issued on York's home, plaintiffs concede that current circumstances do not support a viable claim under the Homeowner's Bill of Rights.  This claim is therefore dismissed without leave to amend.

D.  Real Estate Settlement Procedures Act Claim Against Champion (Claim 1)

Champion contends plaintiffs' RESPA claim must be dismissed because York failed to submit a proper QWR[1] that might have triggered obligations on Champion's part, and because the FAC falls short of tethering plaintiffs' averred damages to any failure to respond adequately to the QWR.  As the FAC indeed lacks a clear description of damages plaintiffs may have suffered as a

---

[1] While Champion lodged with the Court the over two hundred-page response it allegedly sent to York on July 18, 2014 in response to his April 18, 2014 letter, appended to the Declaration of Natalie Mandelin filed in support of Champion's opposition to York's application for preliminary injunction, *see* Docket No. 46, neither party has, to date, filed a copy of the April 18 letter itself.

United States District Court
Northern District of California

1   proximate result of Champion's alleged shortcomings in responding to York's inquiry, plaintiffs'

2   RESPA claim is dismissed with leave to amend.

3        RESPA was, in part, enacted to ensure "consumers throughout the [n]ation are provided

4   with greater and more timely information on the nature and costs of the settlement process and are

5   protected from unnecessarily high settlement charges caused by abusive practices that have

6   developed in some areas of the country." 12 U.S.C. § 2601(a). It provides that borrowers may

7   inquire about federally related mortgages through the making of a QWR. 12 U.S.C. §

8   2605(e)(1)(A). RESPA allows a loan borrower to send the servicer of a federally related mortgage

9   loan a QWR for "information relating to the servicing of such loan." *Id.*

10       To obligate a loan servicer's compliance with RESPA's obligations, a QWR must take the

11  form of "written correspondence" that "(i) includes, or otherwise enables the servicer to identify,

12  the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of

13  the borrower, to the extent applicable, that the account is in error *or* provides sufficient detail to

14  the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)

15  (emphasis added). Although the statute demands no particular "magic words" for an inquiry to

16  qualify as a QWR—indeed, given the statute's "broad remedial purpose," "any request for

17  information made with sufficient detail is enough under RESPA to be a [QWR]"—the Ninth

18  Circuit has clarified that requests for a loan modification or challenges to a loan's validity and

19  terms fall beyond the scope of Section 2605(e)(1)(A)'s requirement that inquiries concern loan

20  servicing issues. *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 666 (9th Cir. 2012).

21       A servicer who receives a QWR must acknowledge receipt within five business days. 12

22  U.S.C. § 2605(e)(1)(A). In addition, within 30 days of receiving the QWR, the servicer must do

23  one of three things: (1) correct the borrower's account and inform the borrower of those

24  corrections in writing; (2) investigate and provide a written explanation to the borrower of the

25  reasons that the servicer believes the borrower's account is correct; or (3) investigate and provide

26  a written explanation to the borrower of the reasons that the servicer cannot obtain the information

27  that the borrower is requesting. 12 U.S.C. § 2605(e)(2). If a servicer fails to respond properly to a

United States District Court
Northern District of California

QWR, the statute entitles a borrower to recover actual damages resulting from the inadequate or untimely response, and additional punitive damages if the plaintiff establishes a "pattern or practice of noncompliance with the requirements" of RESPA.  12 U.S.C. § 2605(f).[2]

Champion contends York's letter was not a valid QWR triggering RESPA obligations because it demanded an "extraordinary amount of information" not covered by Section 2605 without identifying a reason for which York believed his account to be in error.  Specifically, argues Champion, the letter contained no "specific allegations of inaccurate servicing or a description of the reasons for plaintiff's belief that an error had been made on the loan account."  Champion Mot. to Dismiss, p. 10.  The FAC is sparse on details as to the nature of the information York's letter requested,[3] and no party has, to date, filed a copy.  Nonetheless, favorably construed, the FAC demonstrates that Champion received a QWR triggering RESPA obligations.  Champion may, of course, file a motion for summary judgment if its factual assertions to the contrary prove to be beyond dispute.  Presuming BVHPCL's letter was a proper QWR, the parties do not dispute that Champion failed to produce a substantive response within RESPA's required 30 days.

Champion's sole remaining grounds for dismissing plaintiffs' RESPA claim is that the FAC fails to demonstrate how the delay and/or averred inadequacy of Champion's response to the QWR caused plaintiffs actionable harm.  In addition to the elements explained above, to state a

---

[2] While the FAC claims entitlement only to actual damages, plaintiffs attempt in their response to also assert a "pattern or practice."  No such averments appear in the FAC, however.  Reserving judgment as to the viability of "pattern or practice" allegations, any facts plaintiffs wish to aver against Champion in support of punitive damages must be stated clearly in a further amended complaint in order to be cognizable.

[3] Plaintiffs contend in their response to Champion's motion that the letter asked "what [York's] obligations are under the 2009 loan, whether and how much he owes for property taxes, whether the amounts paid on his behalf for taxes and insurance were warranted and/or lawful, and who presently owns his loans," in addition to "when [] inspections of the property [took] place and how much was York charged for these inspections, were late fees assessed, [and] were attorney fees assessed."  Response to Champion's Mot. to Dismiss, pp.6-7.  The FAC, asserting only that BVHPCL drafted a valid QWR, contains no such details; it merely explains that because York had no documents or recollections concerning the 2009 loan transaction and was wary due to the abusive conduct related to the 2007 loan, York's QWR was "broad in its request for documents and information."  *See* FAC ¶ 35.

United States District Court
Northern District of California

viable RESPA claim, a plaintiff must allege that the RESPA breach resulted in actual damages. *Rosenfeld v. JP Morgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 967 (N.D. Cal. 2010).  In general, courts have allowed plaintiffs to plead pecuniary loss liberally, but they must provide more than a mere conclusory statement of damages.  *Allen v. United Financial Mortg. Corp.*, 660 F. Supp. 2d 1089, 1097 (N.D. Cal. 2009).

Here, the FAC states only that Champion must pay damages under RESPA "for their failure [] timely and adequately [to] respond to York's QWR."  FAC ¶ 44.  Lacking averments of actual losses, let alone any link between such losses and Champion's conduct, plaintiffs' RESPA claim as pleaded in the FAC must be dismissed.  Reserving the question of whether losses in the form of emotional distress qualify as actual damages under RESPA, plaintiffs are granted leave to amend to incorporate such contentions, currently presented only in plaintiffs' response, along with any other allegations of actual damages caused by Champion, into a further amended complaint.

E.  Elder Financial Abuse Claims Against BOA, Champion and Perkins (Claim 3)

Under California's Elder Abuse and Dependent Adult Civil Protection Act, elder financial abuse occurs when a person or entity "[t]akes, secretes, appropriates or retains real or personal property of an elder" or assists in doing so "for a wrongful use or with intent to defraud, or both." Cal. Wel. & Inst. Code § 15610.30(a)(1), (2).  "A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult" sixty-five years of age or older.  *Id.* §§ 15610.27; 15610.30(b).  In addition to other legal remedies, a plaintiff who proves that a defendant is liable for elder financial abuse is entitled to reasonable attorney fees and costs.  *Id.* § 15657.5(a).  The statute of limitations allows "four years after plaintiff discovers, or through exercise of reasonable diligence, should have discovered, the facts constituting financial abuse" for a plaintiff to bring a claim, and generally begins to run only once damages have been sustained.   Welf. & Inst. Code § 15657.7.

United States District Court
Northern District of California

1.   *Elder Financial Abuse Claim Against Perkins*

According to the FAC, Perkins committed multiple acts to take and assist in the taking of York's personal property with intent to defraud York and for "wrongful use."  Specifically, plaintiffs aver, Perkins took advantage of York's lack of financial expertise, education level, and age to orchestrate the forgery of Miles's name on the 2007 property grant deed; to encourage York through misrepresentations and omissions to sign the 2007 loan documents; to pressure him into writing checks to ARI; to place the funds he received from the 2007 loan in a later-embezzled PFG account without his consent; and to complete the 2009 loan modification with BOA without York's knowledge or consent—all to execute two reverse mortgages on plaintiffs' house and enrich himself with the proceeds.

Perkins' only responsive contention, that plaintiffs are time-barred from raising this claim, is without merit.  In spite of the FAC's allegations otherwise, Perkins asserts York discovered the second reverse mortgage in 2009 and therefore had only until 2013 to bring this claim.  While plaintiffs do aver that in 2009, York learned from the city clerk that BOA had paid his property taxes, this was not inconsistent with what little Perkins allegedly had told York about the 2007 loan—that York would not have to make any more payments related to his home for the rest of his life.  Under that version of the facts, York had no idea, nor should he necessarily have gleaned from the clerk's statement, that his home was subject to a second 2009 reverse mortgage or that he may have been swindled.

Indeed, it was not until 2013, when York contends he received BOA's letter informing him he was in arrears on his property taxes, that York might first have had reason to believe he had been defrauded.  With help from his daughter Janice Hardy, York made a diligent effort to right the situation as swiftly as possible via the arrears payment agreement to which BOA allegedly agreed over the phone.  When this did not prevent foreclosure proceedings, York took the further step of engaging BVHPCL for professional help to uncover the financial transactions leading up to the present situation.  Having made a more than reasonable effort to understand the financial status of his home as soon as he had reason to believe such efforts were necessary, York should not now

United States District Court
Northern District of California

be barred from holding Perkins accountable simply because Perkins' efforts to avoid detection were, for a number of years, successful. As this suit was commenced just a year after York might first have discovered his potential claims, plaintiffs are, at this juncture, not time-barred from pursuing their elder abuse claim against Perkins.

### 2.   Elder Financial Abuse Claim Against Champion

While it is less clearly asserted, the FAC also appears to state a viable elder financial abuse claim against Champion. Although Champion contends it had no knowledge of the agreement York entered into with BOA to pay off his tax arrears in exchange for forbearance from initiating foreclosure, according to plaintiffs, Champion was aware of this understanding when it commenced foreclosure proceedings on York's home in 2014. A viable claim for elder abuse does not require allegations of bad faith or intent to defraud, but merely the wrongful taking of an elder's property with knowledge that the elder is likely to be harmed as a result. *See Bonfigli v. Strachan*, 192 Cal. App. 4th 1302, 1315-16 (2011). According to plaintiffs, Champion knew York was eighty-eight years old and subsisting entirely on social security income of just $950 per month, but knowingly initiated foreclosure proceedings based on his tax payment arrears, in breach of the agreement. Thus whether or not Champion played a role in inducing York to enter either reverse mortgage, the FAC alleges facts sufficient to show it accepted York's money with no intention of making good on the alleged bargained-for promise that York would, in exchange, get to keep his home.

### 3.   Elder Financial Abuse Claim Against BOA

BOA, alleged to be directly responsible for entering the arrears payment agreement with York as well as "acquir[ing] an interest in the home from an elder via a reverse mortgage that it knew or should have known was not properly originated" in the first place, likewise faces a viable claim for elder financial abuse. While it was Champion who initiated the foreclosure proceedings breaching the agreement, according to plaintiffs, BOA never intended to make good on its promise when it agreed to refrain from a foreclosure action and began accepting York's monthly

payments.[4]  That BOA transferred its interest in York's home to Champion does not now absolve it of financing the 2009 loan to York's detriment, or striking the arrears payment agreement under false pretenses.  For the same reasons discussed above with regard to Perkins, the four-year statute of limitations for elder financial abuse actions does not bar this claim.  Plaintiffs' claim for elder financial abuse against BOA may thus advance.  To the extent plaintiffs elect to aver that BOA bears liability for Perkins' actions as well, they must make that contention clear in a further amended complaint.

F.  <u>Aiding and Abetting Elder Financial Abuse Claims Against All Defendants (Claim 4)</u>

Plaintiffs' claim that each of the defendants aided and abetted elder financial abuse is pleaded in only threadbare and conclusory terms, and must therefore be dismissed with leave to amend.  "In California, a party "aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act" or "(b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person."  *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 882 (N.D. Cal. 2010) (internal quotation marks and citation omitted); *Rosales v. Wells Fargo Bank, N.A.*, 2014 WL 4770572, *6 (N.D. Cal. Sept. 24, 2014) (applying this standard to a claim for aiding and abetting financial elder abuse).

To state a claim, plaintiffs must at the very least allege the specific conduct by which each defendant "substantially assisted" in York's abuse, either while knowing the assisted party's conduct constituted a breach of duty, or by him or herself breaching a duty owed to plaintiffs. Because the FAC falls far short of making such allegations, defendants' statute of limitations defense need not be reached.  As noted above, however, plaintiffs would not be time-barred from stating a claim for aiding and abetting elder financial abuse because the first point at which York

---

[4] While plaintiffs expound on this allegation in their response, should they file a further amended complaint, only factual averments made therein will be taken into consideration.

United States District Court
Northern District of California

1 might have discovered his claim occurred in 2013.

2   G. <u>Breach of Fiduciary Duty Claim Against Perkins (Claim 5)</u>

3   Perkins' motion as to plaintiffs' breach of fiduciary duty claim is denied.  To state a claim

4 for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship,

5 breach of that duty, and damages.  *Benasra v. Mitchell Silberberg & Knupp LLP*, 123 Cal. App.

6 4th 1179, 1183 (2004); *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991).  California courts

7 have recognized that mortgage brokers, according to principles of agency, forge fiduciary

8 relationships with their clients.  They must, therefore, "make a full and accurate disclosure of the

9 terms of a loan to borrowers and to act always in the utmost good faith toward their principals."

10 *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773 (1979).  This includes a duty to disclose all material

11 facts that could affect a principal's decisions.  *Id.*; *Mendoza v. Rast Produce Co.*, 140 Cal. App.

12 4th 1395, 1405 (2006).  Fiduciary duty claims in California are subject to a four-year statute of

13 limitations running from the time the plaintiff discovered or should have discovered the

14 defendant's conduct.  *In re Brocade Communication Systems, Inc. Derivative Litigation*, 615 F.

15 Supp. 2d 1018, 1037 (N.D. Cal. 2009).

16   As York's averred mortgage broker, Perkins was bound to act in York's best interest.

17 This, at the very least, obligated him to describe accurately the terms of the 2007 reverse mortgage

18 in a manner York could understand, and to refrain from exercising undue influence on York's

19 decision to undertake the loan.  According to plaintiffs, Perkins did almost the opposite.  He

20 sought York out precisely to exploit him, arranged for forgery of deed transfer documents, and

21 unduly influenced York into signing away title to his home.  Nor did he stop there; according to

22 plaintiffs, Perkins subsequently embezzled the reverse mortgage proceeds and executed the second

23 2009 reverse mortgage without York's knowledge or consent.

24   Grounded in fraud, plaintiffs' allegations against Perkins must meet Rule 9(b)'s heightened

25 pleading standards described above.  Plaintiffs set forth a clear chronology of their interactions

26 with Perkins, and allege he both negotiated the 2007 loan financed by Nutter and the additional

27 2009 loan financed by BOA.  This is sufficient to give Perkins adequate notice of the particular

28

United States District Court
Northern District of California

1   misconduct alleged so that he may defend against this charge.  *See Maganallez v. Hilltop Lending*

2   *Corp.*, 505 F. Supp. 2d 594, 608-09 (N.D. Cal. 2007).  In addition, Perkins' statute of limitations

3   defense is to no avail.  As earlier noted, a four-year statute of limitations does not bar plaintiffs'

4   claims, as York allegedly only discovered he may have suffered wrongdoing a year, at most, prior

5   to filing this suit.  Plaintiffs' breach of fiduciary duty claim is therefore adequately pleaded and

6   may advance.

7         H.  Unfair Business Practices Claims Against All Defendants (Claim 6)

8         Section 17200, California's Unfair Competition Law ("UCL"), prohibits all unlawful,

9   unfair or fraudulent business acts or practices. Cal. Bus. & Prof. Code §§ 17200 et seq.  Each of

10   these prongs is independently actionable and has been interpreted under separate lines of authority.

11   As the FAC limits itself to allegations under the "unfair" prong, only law governing this provision

12   need be considered.  *See Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1169-

13   70 (2002).  To determine whether a particular business practice is "unfair," courts typically weigh

14   the utility of the defendant's conduct against the gravity of harm to the alleged victim.  *See*

15   *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 852 (2002).  Reference may also be made to

16   whether the practice offends public policy, falls within the "penumbra of some common-law,

17   statutory, or other established concept of fairness," and/or is immoral, unethical, or "substantially

18   injurious" to consumers.  *Id.*

19         Standing to mount a claim under the UCL furthermore requires that a plaintiff have

20   suffered an "injury in fact" and a personal, nontrivial loss of money or property as a result.

21   *Kwikset Corporation v. Superior Court*, 51 Cal. 4th 310, 325 (2011).  Intangible losses do not,

22   therefore, suffice to sustain a claim.  *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 919 (N.D. Cal.

23   2013).  UCL claims are subject to a four-year statute of limitations, under which claims accrue

24   only once a reasonable person would have discovered the factual basis for a claim.  *Aryeh v.*

25   *Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013).

26         *1.  Unfair Business Practices Claim Against Perkins*

27         Perkins' contention that plaintiffs fail to satisfy the UCL's standing requirements is

28

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS
CASE NO.  14-cv-02471-RS

without merit.  The FAC clearly alleges Perkins not only orchestrated the forging of documents that transferred Miles' interest in the house to York, but that he also, without York's knowledge, placed proceeds from the 2007 reverse mortgage in the later-drained PFG account and arranged the second 2009 loan from which York never saw a penny.  Such conduct, if proven, contravened commonly accepted standards of ethics and, as discussed above, amounted to a breach of fiduciary duty.  It furthermore resulted in significant property losses both to Miles, in the form of her interest in the house, and to York, in the form of his interest in the house and/or loan proceeds to which he should have enjoyed unfettered access (assuming, for the moment, the reverse mortgages were validly executed).  Plaintiffs' UCL claim against Perkins is, therefore, permitted to advance.

## 2. *Unfair Business Practices Claims Against BOA and Champion*

The FAC's allegations against BOA and Champion, by contrast, fail to attribute unfair conduct resulting in property loss to either defendant, and must therefore be dismissed.  Even if BOA financed the 2009 loan and breached the oral arrears payment agreement, it is not clear that either act was both unethical and the cause of a clearly alleged economic injury.  Merely financing the 2009 mortgage did not render BOA an immoral actor.  Even if BOA was or should have been aware that the 2009 loan documents were falsified, plaintiffs do not clearly allege an economic injury that flowed specifically therefrom.  Likewise, while BOA may have consented to the arrears payment agreement under false pretenses and/or breached it, thereby injuring plaintiffs, it has not to date resulted in any tangible economic losses according to FAC.

The same goes for Champion's alleged breach of the arrears payment agreement and now-rescinded foreclosure notice; plaintiffs do not adequately aver that either act resulted in a nontrivial loss of tangible property.  At this point, York's house has not been foreclosed upon nor are any foreclosure proceedings pending.  Plaintiffs' UCL claims as to BOA and Champion are, therefore, dismissed.  Plaintiffs are granted leave to amend in the event they can demonstrate, with reasonable particularity, facts to support standing and viable claims under the UCL against BOA and/or Champion.  *See Khoury v. Maly's of California*, 14 Cal. App. 4th 612, 617 (1993).

I.   <u>Negligence Claims Against All Defendants (Claim 7)</u>

California law requires that claims for negligence state (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate or legal cause between the breach, and (4) the plaintiff's injury. *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998). While Perkins' averred conduct satisfies each of these elements, plaintiffs fail to allege any particular duties arising under tort law principles that BOA and Champion owed to them. The negligence claim against Perkins alleged in the FAC may therefore advance; its claims against BOA and Champion are, however, dismissed with leave to amend.

1.   *Negligence Claim Against Perkins*

As noted above, Perkins undertook a fiduciary duty to provide York with all relevant information and to pursue York's best interests when he elected to serve as York's mortgage broker. Swindling York into two reverse mortgages by way of fraud and forgery and profiting personally from the proceeds is conduct that, if proven, would amount to a clear breach of this duty. Plaintiffs were both materially injured as a proximate result of Perkins' actions; indeed, Miles lost her title to the home, and York was left with neither his title nor the proceeds of either mortgage. Plaintiffs' negligence claim against Perkins may, therefore, advance.

2.   *Negligence Claims Against BOA and Champion*

By contrast, the respective roles of BOA and Champion in the reverse mortgages and arrears payment arrangement do not, as currently pleaded, give rise to duties sounding in tort law. Lenders and loan servicers in California do not ordinarily owe borrowers or third parties any duties beyond those expressed in the loan agreement. *Castaneda v. Saxon Mortgage Services*, 687 F. Supp. 2d 1191, 1198 (E.D. Cal. 2009). That said, special circumstances may give rise to a duty of care in instances where a lender has actively participated in the financial transaction giving rise to the loan "beyond the domain of the usual money lender." *Wagner v. Benson*, 101 Cal. App. 3d 27, 35 (1980). A lender may furthermore be held secondarily liable for the actions of a mortgage broker with which it shares an agency relationship. *Plata v. Long Beach Mortgage Company*, 2005 WL 341375, at *8 (N.D. Cal. Dec. 13, 2005). According to the FAC, BOA and Champion

United States District Court
Northern District of California

United States District Court
Northern District of California

acted in the "usual" manner of lenders and loan servicers.  They did not seek out York or influence him to engage in any of the transactions leading up to his present situation; nor do plaintiffs aver that either BOA or Champion shares a relationship with Perkins that would place responsibility, vicarious or otherwise, for his conduct on its shoulders.  Any duties to which the arrears payment agreement gives rise are grounded in principles of contract law, and are therefore inappropriate for consideration here, under a claim sounding in tort.  Plaintiffs may allege any other duties they believe give rise to negligence claims against BOA and Champion in a further amended complaint.

> J.   <u>Rescission and Restitution Claims Against All Defendants (Claim 8)</u>

According to the FAC, both the 2007 and 2009 loan agreements should be deemed void because they were obtained through multiple acts of fraud, undue influence, forgery, and active misrepresentation.  Specifically, plaintiffs aver that Miles' signature on the grant deed transferring her interest in the home was forged and therefore renders void all subsequent transactions concerning title to the home, as they were entered without Miles' consent.  But for Perkins' misrepresentations about his financial obligations going forward, moreover, York would not have signed the 2007 loan documents.  In addition, Perkins thereafter allegedly forged the 2009 loan agreement and altogether concealed it, along with its proceeds, from plaintiffs.  Under theories of rescission and restitution, plaintiffs accordingly claim that an appropriate remedy would restore them to the position they held prior to Perkins' first interaction with York as tenants-in-common with title to the home, and order disgorgement of all costs, fees, commissions, and loan proceeds plaintiffs have expended or lost to defendants since the grant deed transfer.

California Civil Code Section 1689 permits a party to a contract to rescind the agreement unilaterally if his consent to the contract was obtained through mistake, fraud, duress, or undue influence.  Cal. Civ. Code § 1689(b)(1).  In addition, a deed executed through misrepresentation is void, and title to the property at issue therefore remains in the grantor's name.  *Wutzke v. Bill Reid Painting Service, Inc.*, 151 Cal. App. 3d 36, 43 (1984).  While the statute of limitations for rescission claims is four years, "where the ground for rescission is fraud or mistake, the time does

not begin to run until the discovery by the aggrieved party of the facts constituting the fraud or mistake." Cal. Civ. Proc. Code § 337.  Here, as noted above, 2013 was the earliest York may have discovered his claims, which arise from averred fraud and forgery.

      *1.  Fraud*

A viable fraud claim must aver, with particularity sufficient to meet Rule 9(b)'s heightened pleading standards: (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant knew the representation was false at the time it was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably and reasonably relied on the representation; and (5) the plaintiff suffered resulting damages.  *Ragland v. U.S. Bank National Association*, 209 Cal. App. 4th 182, 199-200 (2012).  Favorably construed, the FAC avers Perkins gave York false assurances that upon entering the 2007 loan, York would never again have to pay taxes or insurance costs on his home.  Having sought out York and visited his home multiple times to extend this offer, Perkins gained York's trust and offered him a way to access funds for needed home repairs York was, otherwise, unable to afford.  Given York's age and mental faculties as plaintiffs describe them, it is not unreasonable for York to have relied on Perkins' representations and followed his lead when Perkins encouraged him to sign the loan documents in haste.  Perkins carried out this plan of deception, it appears, to access the proceeds of the loan for his own enrichment—which he did through York's payments to ARI and, conceivably, the PFG account into which he placed the remaining loan proceeds.  Plaintiffs were thus left with neither title to their home, nor full and free access to the proceeds from the reverse mortgage.

The FAC thus contains sufficient factual averments to support plaintiffs' claim that the 2007 mortgage was obtained through fraud and is eligible for rescission.  In addition, plaintiffs' forgery allegations addressed below offer an independent basis to find, at this juncture, that rescission and restitution constitute an appropriate remedy for all of the described transactions between plaintiffs and defendants.

### 2.  Forgery

A person may be found culpable for forgery if he or she, with intent to defraud, knowingly falsified an instrument or writing conveying property by signing the name of another person without authority, or by signing a fictitious name.  A forgery, in other words, "is a writing which falsely purports to be the writing of another."  *Wutzke*, 151 Cal. App. 3d 36, 41 (1984).  The facts as pleaded demonstrate that, at Perkins' direction, Maxwell forged Miles' signature on the grant deed documents, rendering transfer of title to York void.  It follows that the subsequent 2007 reverse mortgage, obtained with only York's signature, and the 2009 reverse mortgage, obtained with signatures from neither plaintiff, should be found void as well.  "It has been uniformly established that a forged document is void ab initio and constitutes a nullity; as such it cannot provide the basis for a superior title as against the original grantor." *Id.* at 43.  The forgeries plaintiffs aver therefore would sustain a claim for rescission that would restore plaintiffs' tenancy-in-common title to the house and undo both reverse mortgages as well as the arrears payment agreement.

### K.  Breach of Contract and Promissory Estoppel Claims Against BOA and Champion (Claims 9 and 10)

Plaintiffs allege that both BOA and Champion are liable for breach of contract or, in the alternative, promissory estoppel, for reneging on the averred oral arrears payment agreement pursuant to which York made monthly $200 installment payments to BOA.  In spite of York's reliance on BOA's agreement to refrain from initiating foreclosure proceedings and his partial performance in the form of monthly installment payments, plaintiffs aver, Champion in April 2014 provided York with a since-withdrawn notice of default.  As BOA's successor in interest, plaintiffs contend, Champion was aware of the agreement BOA entered and bore a responsibility to abide by it.  Yet, because agreements of this type generally fall within the statute of frauds, and plaintiffs have not pleaded facts to demonstrate estoppel to the statute's assertion, plaintiffs' claims for breach of contract and promissory estoppel are dismissed with leave to amend.

A breach of contract claim must plead the existence of a contract, plaintiff's performance

1    of the contract or excuse for nonperformance, defendant's breach, and resulting damages.

2    *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D.Cal. 2012) (internal citation omitted).  In

3    addition, the statute of frauds generally requires an agreement of the type at issue here, an

4    attempted modification to a deed of trust or mortgage, to be placed in writing.  *See* Cal. Civ. Code

5    §§ 1624, 2922 ("[A] mortgage can be created . . . only by writing"); *Secrest v. Security Nat.*

6    *Mortg. Loan Trust 2002-2*, 167 Cal. App. 4th 544, 553 (2008) (finding claims based on an oral

7    agreement for an arrears payment in exchange for forbearance from foreclosure barred by the

8    statute of frauds).  Here, plaintiffs do not dispute that the agreement at issue was an attempted loan

9    modification entered orally, via a phone conversation between York's daughter and a BOA agent,

10   not in writing.[5]  Rather, they contend that York's partial performance and reliance on the

11   understanding reached with BOA should estop application of the statute of frauds.

12              While in certain instances full or partial performance would suffice to establish estoppel,

13   California law has limited its scope to situations in which performance consisted of conveying

14   property, providing personal services, or conduct other than payment of money, reasoning that

15   persons aggrieved only through loss of money "have legal means to recover that money if they are

16   entitled to its return or have not received credit for it."  *Secrest*, 167 Cal. App. 4th at 556

17   (aggregating cases); *In re Marriage of Benson*, 36 Cal. 4th 1096, 1109 (2005) (allowing part

18   performance to remove a contract from the statute of frauds where "unconscionable injury" would

19   otherwise occur); *Anderson v. Stansbury*, 38 Cal. 2d 707, 716 (1952) ("Before a party can be

20   estopped to assert the statute due to the other's part performance, it must appear that a sufficient

21   change of position has occurred so that the application of the statutory bar would result in an

22   unjust and unconscionable loss, amounting in effect to a fraud.").

23              Plaintiffs do not dispute that the arrears payment agreement was never placed in writing,

24

---

25   [5] In their response to BOA's motion, plaintiffs contend that loan records in BOA and/or
     Champion's possession contain writings sufficient to satisfy the statute of frauds.  Reserving the
26   question of whether such documents might operate to show the existence of a valid written
     contract, such allegations must be incorporated into a further amended complaint in order to be
27   cognizable.

28

United States District Court
Northern District of California

and allege that York partially performed only through his monthly $200 installment payments. Averring no additional change of position resulting "in an unjust and unconscionable loss" or non-monetary partial performance, plaintiffs therefore fail to state a claim for breach of contract or to justify application of estoppel.  They may, however, plead additional facts or law demonstrating that the statute of frauds is satisfied or inapplicable in a further amended complaint.

L.   Quiet Title Claims Against Champion (Claim 11)

Plaintiffs assert by means of a quiet title claim Miles' and York's joint interest in the home.  Because Miles' signature on the grant deed was forged, they reason, all subsequent transactions involving title to the home must be void, and Miles should be declared a co-owner of the home as tenants-in-common with York.

California Code of Civil Procedure Section 760.010 provides for an action "to establish title against adverse claims to real or personal property or any interest therein."   A claim must identify the title sought and claims against which it is sought; the property's description and address; and a request for a determination of title.  Cal. Civ. P. Code § 761.020.  Plaintiffs have submitted that the property at issue is 80 Conkling Street in San Francisco, and describe in considerable detail the transactions giving rise to their dispute over title.  As defendants offer no reason to dismiss this claim, it is permitted to advance.

M.  Declaratory Relief Claim Against All Defendants (Claim 12)

To sustain a declaratory relief claim, the controversy must be "real, substantial and capable of specific relief through a decree of conclusive character."  *Wilson & Wilson v. City Council of Redwood City*, 191 Cal. App. 1559, 1581-82 (2011).  Plaintiffs' factual averments and legal claims demonstrate that there exists a live controversy over the current state of title to York's home, along with the validity of the grant deed, 2007 and 2009 mortgage agreements, and arrears payment agreement.  Plaintiffs' request for a declaration of each party's respective rights and responsibilities therefore appears warranted at this juncture.

**V. CONCLUSION**

For all of the aforementioned reasons, the motions to dismiss filed by BOA, Champion,

Talcott, Nutter, and Perkins are granted in part and denied in part, with partial leave to amend as specified in the discussion above.  Any amended complaint plaintiffs elect to file must be filed within thirty (30) days from the date of this order.

**IT IS SO ORDERED**.

Dated: June 8, 2015

_____
RICHARD SEEBORG
United States District Judge